AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California



| United States of America, | |
|---|---|
| v. | Case No.  5:22-mj-00379-DUTY |
| Alvaro Hector Martinez, | |
| Defendant. | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on an unknown date and continuing until at least in or around March 2021, in the counties of Los Angeles and Riverside in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 846 | Conspiracy to distribute and possess with intent to distribute controlled substances. |

This criminal complaint is based on these facts:

**Please see attached affidavit.**

*/S/ Albert Polito III*
*Complainant's signature*

DEA Special Agent Albert Polito III
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: June 13, 2022

*Judge's signature*

City and state: Los Angeles, California      Maria A. Audero, United States Magistrate Judge
*Printed name and title*

**AFFIDAVIT**

I, Albert Polito III, being duly sworn, declare and state as follows:

**PURPOSE OF AFFIDAVIT**

1. This affidavit is made in support of an application for a criminal complaint against and warrant to arrest **ALVARO HECTOR MARTINEZ** ("**MARTINEZ**") for 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances).

2. The facts set forth in this affidavit are based on my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.

3. This affidavit is intended to show only that there is probable cause for the requested complaint and arrest warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.

4. Unless stated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Further, unless stated otherwise, all dates and amounts in this affidavit are approximations, and the words "on or about" and "approximately" are omitted for clarity.

**BACKGROUND OF AFFIANT**

5. I have been a Special Agent with the Drug Enforcement Administration ("DEA") since January 2020. I am currently assigned to the DEA's High Intensity Drug Trafficking Area Group 48 ("HIDTA 48"), which investigates large-scale drug trafficking

organizations. During my time with the DEA, I have received 640 hours of narcotics law enforcement training while attending DEA Basic Agent Training at the DEA Academy in Quantico, Virginia.

6.  I have participated in investigations into drug trafficking and drug trafficking organizations. These investigations involved (1) the unlawful importation, exportation, manufacture, possession with intent to distribute, and distribution of drugs (including cocaine, heroin, fentanyl, methamphetamine, and marijuana), (2) the laundering of drug proceeds and monetary instruments derived from drug trafficking activities, and (3) conspiracies to traffic drugs.

7.  I am familiar with the methods drug traffickers use to conceal profits and launder proceeds of narcotics transactions. I am experienced in the use of tracking devices, surveillance, interviewing witnesses, writing affidavits for and participating in the execution of search warrants, and working with undercover agents, cooperating defendants, and confidential sources.

### SUMMARY OF PROBABLE CAUSE

8.  In January 2021, DEA agents had a confidential source ("the CS") reach out to a Sinaloa drug trafficker named "**Bebe**" via phone to buy methamphetamine and fentanyl pills. During those conversations, **Bebe** told the CS that he could supply bulk methamphetamine and fentanyl through his Los Angeles associate, who agents later identified as **ALVARO HECTOR MARTINEZ**.

9.  On February 10, 2021, through the CS, agents made a controlled purchase of approximately two pounds of methamphetamine from **MARTINEZ**.

10. On March 4, 2021, the CS called **Bebe** to order 40 pounds of methamphetamine, two kilograms of heroin, and 5,000 fentanyl pills. **Bebe** ultimately agreed to supply the CS with those drugs through **MARTINEZ** on March 15, 2021.

11. On March 15, 2021, in anticipation of the controlled purchase, agents conducted surveillance on **MARTINEZ** and observed **MARTINEZ** drive away from a particular house on Spring Street in Perris, California ("the Spring Street residence"). Law enforcement then conducted a traffic stop of the car **MARTINEZ** was driving, and encountered **MARTINEZ** as the driver and **Lopez** as the passenger. In the passenger compartment of the car, law enforcement discovered 35 bricks containing 15.43 kilograms of methamphetamine. The deputies then arrested **MARTINEZ** and **Lopez** and searched them incident to arrest.

12. Following the traffic stop, law enforcement executed a search warrant on the Spring Street residence and found two ziplock bags and five containers of methamphetamine that weighed more than eight kilograms, 12.5 pounds of marijuana, five gallons of methamphetamine solution, methamphetamine sludge, two rifles, two handguns, eight magazines, 41 rounds of ammunition, tactical vests, and a methamphetamine conversation laboratory. Along with the methamphetamine, methamphetamine lab, drug paraphernalia, rifles, handguns, ammunition, and tactical vests, law enforcement also encountered two young children in the Spring Street residence.

**STATEMENT OF PROBABLE CAUSE**

13. Based on my review of law enforcement reports, records, surveillance, phone call recordings with the targets, seized tangible evidence, my own observations and knowledge of the investigation, and other reliable sources of information, I am aware of the following:

**I.    Confidential source ("the CS")**

14. This case involved a confidential source ("the CS"), who has been cooperating with the DEA since 2004. The CS works for monetary compensation and not to reduce charges. The CS has a conviction that is more than 20 years old for corporate injury on a spouse, but no convictions since.

15. The actions of the CS described in this affidavit were conducted at the direction of DEA agents and task force officers.

16. Agents recorded, and I have reviewed, the phone calls involving the CS described in this affidavit. The conversations described below are based on my review of those phone calls and their translations.

**II.   DEA makes a controlled buy of methamphetamine from "Bebe" and MARTINEZ (February 10, 2021)**

17. In January 2021, agents had the CS reach out to a Sinaloa drug trafficker named "Bebe" via phone to buy methamphetamine and fentanyl pills. During those conversations, **Bebe** told the CS that he could supply bulk methamphetamine and fentanyl through his Los Angeles associate, who agents later identified as **Alvaro MARTINEZ** ("**MARTINEZ**").

18. On February 1, 2020, the CS told **Bebe** that he wanted to buy two pounds of methamphetamine and 100 fentanyl pills to verify quality. **Bebe** agreed.

19. Eight days later, on February 9, 2021, the CS called **Bebe**, who confirmed that he would have his associate, referring to **MARTINEZ**, call the CS.

20. Later that day **MARTINEZ** called from a phone number ending in 1170 ("the 1170 phone") and told the CS that he would meet him the next day for the transaction, that **MARTINEZ** would coordinate with **Bebe** in the meantime, and that **MARTINEZ** would contact the CS from the 1170 phone.

21. Following that conversation, the Honorable Judge Margaret Bernal, Superior Court of Los Angeles County and State of California, signed a warrant authorizing law enforcement to collect location data associated with **MARTINEZ**'s 1170 phone.

22. On February 10, 2021, **MARTINEZ** called the CS and told him that the minimum quantity of fentanyl he would deal is 1,000 pills. At the direction of agents, the CS responded to **MARTINEZ** that for the time being he only wanted to buy two pounds of methamphetamine for $3,200. **MARTINEZ** agreed to sell the CS two pounds of methamphetamine, and the two agreed to meet at a parking lot on North Sepulveda Boulevard in Manhattan Beach, California.

23. The same day, at 1:20 p.m., law enforcement (while conducting surveillance) observed **MARTINEZ** -- driving a white Nissan Rogue ("the Nissan") registered to an address on Via Marisol in Los Angeles, California ("the Via Marisol residence")

-- arrive and park near the CS, who got out of his car and walked toward **MARTINEZ**, where **MARTINEZ** handed the CS approximately two pounds of methamphetamine in exchange for $3,200 of DEA funds.[1]

24. Following the transactions, law enforcement tried to follow **MARTINEZ**, but terminated surveillance when **MARTINEZ** began driving erratically.

25. During a subsequent debrief, the CS told agents that in the parking lot, he used the DEA funds to purchase the two pounds of methamphetamine from **MARTINEZ**, and that **MARTINEZ** offered to supply the CS with in excess of 50 pounds of methamphetamine and said that he would only need a few days to get approval from his bosses in Mexico. The methamphetamine the CS purchased appeared as follows:



**III. Surveillance of MARTINEZ (February 16 to March 3, 2021)**

26. Between February 16 and March 3, 2021, law enforcement reviewed the location data associated with the 1170 phone

---

[1] A DEA laboratory report shows that the amount of pure methamphetamine **MARTINEZ** distributed to the CS was 872 grams, plus or minus 54 grams.

(seized pursuant to the search warrant described above) and conducted surveillance on **MARTINEZ**. The results of the surveillance during that time were as follows:

 a. On numerous occasions during the timeframe between February 16 and March 3, 2021, the 1170 phone routinely pinged from the area of Via Marisol residence and a particular house on Spring Street in Perris, California ("the Spring Street residence").

 b. On February 16, 2021, law enforcement observed a gold Honda Accord ("the gold Accord") bearing license plate 8BEP064 parked in the driveway of the Spring Street residence.

 c. On February 26, 2021, law enforcement surveilled the Spring Street residence and saw the gold Accord in the driveway. At the time, location data showed the 1170 phone in or near the Spring Street residence.

 d. On March 3, 2021, law enforcement observed that the 1170 phone was pinging at the Spring Street residence and established surveillance on the home. At the time, the gold Accord was in the driveway of the Spring Street residence. The gold Accord then drove away from the Spring Street residence and the 1170 phone co-located with the vehicle, indicating that **MARTINEZ** was in the gold Accord.

 **IV.** **Traffic stop of the gold Accord and search of Spring Street residence (March 15, 2021)**

27. On March 4, 2021, the CS called **Bebe** to order 40 pounds of methamphetamine, two kilograms of heroin, and 5,000

fentanyl pills. **Bebe** agreed to supply the CS with those drugs through **MARTINEZ** in the following weeks.

28.  On March 9, 2021, the Honorable Margaret Bernal, Superior Court of Los Angeles County and State of California, signed a warrant authorizing the continued collection of location data associated with the 1170 phone.

29.  On March 12, 2021, the CS called **Bebe** to request that the transaction occur three days later, on March 15, 2021, in the Los Angeles area. **Bebe** agreed.

30.  On March 15, 2021, law enforcement surveilled the Spring Street and Via Marisol residences, and saw the gold Accord at the Via Marisol residence.

31.  At 8:00 a.m., the CS confirmed with **Bebe** that **Bebe**'s associate, **MARTINEZ**, would deliver the methamphetamine and fentanyl that day.

32.  At 9:56 a.m., law enforcement saw an individual, consistent with **MARTINEZ**'s appearance, in the gold Accord leave the Via Marisol residence and drive in the direction of the Spring Street residence.

33.  At 12:00 p.m., the CS called **Bebe** to ask for an update on the location of **MARTINEZ**.

34.  Less than 30 minutes later, law enforcement saw the gold Accord arrive at the Spring Street residence and enter through the front gate.

35.  At 2:00 p.m., **MARTINEZ** called the CS using the 1170 phone and asked the CS to drive closer to Riverside for the

deal. At the time, the 1170 phone was pinging in or near the Spring Street residence.

36. At 2:13 p.m., **MARTINEZ** texted the CS the new meeting location, which was a parking lot in Lake Elsinore, California.

37. At 3:05 p.m., the gold Accord drove away from the Spring Street residence.

38. Several minutes later, Deputy Remington of the Riverside's County Sheriff's Office conducted a traffic stop of the gold Accord and encountered **MARTINEZ**, who immediately said that he was driving with a suspended license. Deputy Remington also encountered an individual with the initials ADL as the passenger. No one else was in the car.

39. Once **MARTINEZ** stated that he did not have an active license, Deputy Remington asked **MARTINEZ** to get out of the car. **MARTINEZ** complied, then consented to a search of the gold Accord. In the car, Deputy Remington found two cardboard boxes in the backseat of the gold Accord. Contemporaneously, Deputy Ray deployed his canine Rex, who alerted to the presence of narcotics in the backseat of the vehicle. In the box, deputies found 35 bricks of methamphetamine containing 15.43 kilograms of

pure methamphetamine. The box and methamphetamine from the gold Accord that **MARTINEZ** and **Lopez** occupied appeared as follows:



40. The deputies then arrested **MARTINEZ** and ADL and searched them incident to arrest.

41. While the deputies searched the gold Accord, law enforcement observed a woman, whose initials are SR, walk out of the Spring Street residence and place an object in the passenger seat of a car in the driveway, then go into the house, return, and place another object in the car.

42. Law enforcement subsequently moved in and detained SR, then secured the house while an agent sought a warrant for the Spring Street residence.

43. Approximately two hours later, the Honorable Margaret Bernal, Superior Court of Los Angeles County and State of California, signed a warrant authorizing a search of the Spring Street residence and gold Accord.

44. In the Spring Street residence, law enforcement found two ziplock bags and five containers of methamphetamine that weighed more than eight kilograms, approximately 12.5 pounds of marijuana, five gallons of methamphetamine solution,

methamphetamine sludge, two rifles, two handguns, eight magazines, 41 rounds of ammunition, tactical vests, and a methamphetamine conversion laboratory in the backyard.

45.  Other than SR, law enforcement only encountered two young boys, who were two and three years old, in the Spring Street residence. Child Protective Services subsequently responded to the Spring Street residence.

46.  The firearms and ammunition discovered in the Spring Street residence were as follows:

    a.  A .223 caliber black semi-automatic rifle, no known brand or markings, and one magazine.

    b.  A black, Sturm, Ruger, and Co. .223 caliber bolt-action rifle bearing serial number 180-32701, model mini-14, and one magazine.

    c.  A silver Bersa Hispano Argentine De Automotives SA .45 caliber semi-automatic handgun with a black grip, model 1911A1, bearing serial number 100803, and five corresponding magazines.

    d.  A black Stoeger Cougar 8000 9mm semi-automatic handgun bearing serial number T6429-08-A020238, model Cougar 8000 F, and one corresponding magazine.

    e.  Eight rounds of 300 Winchester Magnum rifle ammunition.

    f.  16 rounds of .45 caliber ammunition.

    g.  17 rounds of 9mm ammunition of various brands.

47. Following procedures, a DEA team dismantled and destroyed the methamphetamine lab in the Spring Street residence.

48. No one other than SR's young children were found in the Spring Street residence.

49. The firearms, tactical vests, methamphetamine, and methamphetamine lab appeared as follows:








**V.    MARTINEZ's criminal history**

50.    Certified conviction records show that **MARTINEZ** has the following convictions that prohibit him from possessing a firearm or ammunition:

    a.    Grand theft of personal property, in violation of California Penal Code Section 487(a), in the Superior Court for the State of California, County of Los Angeles, case number PA076446, on or about March 25, 2013.

    b.    Possession of a firearm by a felon (one prior), in violation of California Penal Code Section 29800(a)(1), in the Superior Court for the State of California, County of Los Angeles, case number BA416740, on or about September 26, 2013.

## CONCLUSION

51.    Based on the foregoing, there is probable cause to issue the requested complaint and arrest warrant.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this __13th__ day of ___June___, 2022.

_____
THE HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE